IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

**UNITED STATES OF AMERICA,**

          **Plaintiff,**

**v.**                                                     **Case 2:14-cr-20023-SHL**

**PATRICK JACKSON,**

          **Defendant.**

---

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS**

---

Before the Court is Defendant Patrick Jackson's Motion to Suppress. (Docket Entry "D.E." #32). The instant motion was referred to the United States Magistrate Judge for Report and Recommendation. (D.E. #33). The Magistrate Judge held a hearing on the instant motion on December 4, 2014. For the reasons set forth herein, it is recommended that Defendant's Motion to Suppress be DENIED.

**I. Proposed Findings of Fact**

On August 29, 2013, officers with the Memphis Police Department's Crump Station Violent Crimes Task Force were assigned to "saturate" and patrol Ward 425 of their precinct to "focus on burglaries," which had been occurring frequently, "especially along the green line." (Mot. to Suppress, Dec. 4, 2014 Hearing Transcript ("Tr.") at 12-14, 68-70, 103). On that morning, a "burglary call went out" from dispatch to the officers in the vicinity. (Tr. at 15, 43, 57-58, 70-71). At approximately 11:37 or 11:40 a.m. on that date, Officer Michael Davis of uniform patrol was

1

assigned to respond to the burglary call at 664 North Dickerson, which is located "at or near North Watkins and Vollintine." (*Id*. at 69, 71, 86-87, 92-93 & Exh. 4 ("Incident Report"), Exh. 5 ("Log Sheet")). The burglary report stated that "the homeowner[s] came home and found their home had been broken into." (*Id*. at 71). Between 11:40 and 11:48 a.m., Officer Davis and another officer were dispatched to and arrived at the residence, and they then "went in and cleared the scene with them, made sure . . . the suspect wasn't inside," and "began a report." (*Id*. at 87, 91, 92-93, 96-98 & Exh. 4). As Officer Davis created the Incident Report, the homeowners, Walter Redfern and Sammy Gullett, "were continuing their inventory of the house to figure out what all was missing." (*Id*. at 88, 114, 123).

While Officer Davis was in the process of investigating the burglary, Task Force Officers Keith Moffitt and Joshua Brown were "driving around the area looking for anything suspicious." (*Id*. at 15). One of Officer Moffitt's task force partners, Officer Beauchamp,[1] "keyed up on the radio" and "advised that he had an individual" at 919 North Watkins Street near Vollintine "that was sweating profusely, had a backpack on, a camera case around his neck, and kept looking back at him." (*Id*. at 15, 26, 36 & Exhs. 2 & 7). Officer Moffitt was "a couple of hundred yards north" from Officer Beauchamp at the time; from his position, he could see Officer Beauchamp but was "just stuck at the red light." (*Id*. at 15-16). Officer Beauchamp advised Officer Moffitt that he "was going to talk to the guy," who was later identified as Defendant, and Officer Moffitt responded that he "would be there in just a second." (*Id*. at 16, 24-25, 74-75). Officer Brown pulled over at a location a "few blocks away" to head towards Officer Beauchamp's location "for officer safety to

---

[1] At the time of the hearing on the instant motion, Officer Beauchamp was deployed on military leave to Jacksonville, Florida. (*Id*. at 52). He was subpoenaed by both parties but was not present at the hearing due to his deployment. (*Id*. at 52, 132).

2

assist [his task force] partner." (*Id*. at 72-73).

When Officer Moffitt arrived "less than a minute" later at the location where Officer Beauchamp had engaged Defendant, he observed that Officer Beauchamp had not activated his car's blue lights; Officer Moffitt also did not activate his own car's blue lights or "run out at him." (Tr. at 17-19, 57). Officer Moffitt observed that Defendant "fit . . . the description of the possible burglar due to the fact that he had a backpack on and the communication with the other officers that he kept his eye communicating, he kept looking and staring at the officer, like what's he thinking, what's he going to do." (*Id*. at 16-18). Officer Moffitt based this conclusion about Defendant on his almost four years of experience on the Violent Crimes Task Force making a "lot" of burglary arrests. (*Id*. at 16).

Officer Moffitt did not know what Officer Beauchamp had asked Defendant before he arrived, but Officer Moffitt first asked Defendant what he was doing that day and observed that he was "sweating real bad." (*Id*. at 19, 50). Defendant replied that he "just got through scrapping with some friends." (*Id*.) Officer Moffitt asked if he could search his backpack, which Defendant refused. (*Id*.) Officer Moffitt found his refusal suspicious because "a lot of times, if they have nothing to hide, they don't mind if we look in the backpack." (*Id*. at 20). Officer Moffitt asked what was in the backpack, which was "full," and Defendant stated that "a pair of shoes" was inside it. (*Id*. at 19-20).

Officer Moffitt then asked for Defendant's name and date of birth and logged into the "Shelby County W.A.S.P." ("WASP") database to research him. (*Id*. at 17, 20-21, 65). The WASP database provides "pictures, his previous arrests, his previous warrants, [and] every report he's been a suspect, victim, or witness in." (*Id*. at 20-21). Officer Moffitt said he searches the WASP database

3

for any suspect to find out if the individual has any warrants or prior arrests, is being truthful about details such as place of residence, and to gather "just any information." (*Id*. at 66). Officer Moffitt did not ask for Defendant's identification because he did not need it to search the WASP database when Defendant had provided his name and date of birth. (*Id*. at 63-64).

Officer Moffitt determined from the WASP database search that Defendant had provided the correct name and date of birth and did not have any current warrants. (*Id*. at 66). When Officer Moffitt saw that Defendant "had lots of warrants in his past for aggravated burglary," he "just simply asked him, have you ever been arrested for burglary before." (*Id*. at 17, 21). At this time, Defendant "started shaking real bad [sic]" and "convulsing," had "what appeared to be a seizure" or an episode where he "overheated," and "fell to the ground." (*Id*. at 17, 21, 49, 61). When Defendant fell, a pill bottle "fell out of his pants." (*Id*. at 21, 23). After falling, Defendant was "just laying there" and "appeared to be tensed up" with "his muscles tight and shaking." (*Id*. at 62). Defendant remained responsive and stated that he was "hot." (*Id*.)

Officer Moffitt's "first concern" was for Defendant and to "render care" to him, so he called for an ambulance at 11:56:57, took the suspect's backpack and "sat it next to him" where he could see it but did not search it, and offered him water from a cup in his patrol car. (*Id*. at 21-22, 61-62 & Exhs. 2 & 7). While he treated the situation as a medical emergency, Officer Moffitt also considered the possibility that it was being feigned, as "it's . . . a known tactic for [a suspect] to distract us and then take off running." (*Id*. at 61). At some point during this fluid interaction that was part investigation and part attempt to render medical assistance, Officer Moffitt also picked up the pill bottle that had fallen from Defendant's pants, and he "noticed his name wasn't on it and that it had the address of the burglary call that went out." (*Id*. at 23, 58, 76).

4

While they were awaiting the ambulance—which was only a "couple of minutes" or less after Officer Beauchamp first advised that he had observed the suspect—Officer Brown, whose IBM number is 12100 and car number is 6413, also arrived at the scene and saw Defendant sitting down with some water with a "full" backpack "sitting next to him" that "hadn't been opened." (*Id.* at 72-75, 79-81). Defendant was not in handcuffs when Officer Brown arrived. (*Id.* at 75). Officer Brown also became aware than an ambulance had been called to assist Defendant and that a pill bottle had fallen out of his pocket. (*Id.* at 75-76). Officer Brown also concluded that the circumstances were suspicious because Defendant was sweating profusely and had a camera around his neck. (*Id.* at 78). Officer Brown stated that, while this incident occurred in August in Memphis, he did not believe that the weather that day was hot enough to be sweating profusely and, thus, that he associated Defendant's sweating with either "nervousness" or "particularly running" even though he did not observe Defendant running at any time. (*Id.* at 80).

An ambulance arrived within approximately five minutes from the time the call was placed for medical assistance, and Gordon Whisenhunt, a trained emergency medical technician with the Memphis Fire Department, examined Defendant. (*Id.* at 23, 136, 139). By the time Whisenhunt arrived, Defendant was "sitting in handcuffs." (*Id.* at 139, 141). Defendant advised Whisenhunt that he was hot, was not in pain, and did not want to be transported to the hospital. (*Id.*) Whisenhunt found Defendant to be "hot," "sweating," "stable[,] and not experiencing any trauma," including a seizure, and did not render any treatment to Defendant. (*Id.* at 139-40, 144-46). Whisenhunt did not observe any reason why Defendant would have suddenly fallen to the ground and appeared to seize. (*Id.* at 145-46). After examining Defendant, Whisenhunt prepared the Division of Fire Services First Responder Incident Report. (*Id.* at 143 & Exh. 6 ("First Responder Incident

5

Report")).

While Whisenhunt was rendering medical aid to Defendant, Officer Moffitt "keyed up and tried to raise the officer on the scene of the burglary," which was Officer Davis, to ask "what the victim's name was" and "what was taken." (*Id*. at 23-24, 58, 76, 88, 99-100). Officer Moffitt was advised by Officer Davis that the name on the pill bottles matched the name of one of the burglary victims and that the address on the pill bottles matched the residence where the burglary occurred. (*Id*. at 24, 59, 76). Officer Davis also provided a list of "every single item that was taken" to the victims' knowledge at that point, although the victims were still "inventorying the house." (*Id*. at 42, 76, 88).

Ultimately, the medical personnel determined that Defendant's health issues were due to the heat rather than to a seizure. (*Id*. at 49). Defendant was subsequently searched and the following items were recovered: a Sony camera; a Ruger revolver; a necklace; a Dell laptop computer; currency; two pill bottles; marijuana; a pair of bolt cutters; a crow bar; two flathead screw drivers; an empty blue pillowcase. (*Id*. at 44-45, 59-60 & Exh. 1). Defendant was arrested at 12:05:09, approximately ten minutes after he was first observed by Officer Beauchamp. (*Id*. at 51, 164 & Exh. 2). The property was brought to the victims, was identified by them as being their possessions, and, with the exception of the firearm and the marijuana, was returned to them. (*Id*. at 60, 76-77, 111, 117, 120-21, 126-27).[2] At no time during the entire interaction with Defendant did Officer Moffitt lay hands on Defendant or did Officer Moffitt witness Officer Beauchamp lay hands on Defendant. (*Id*. at 17, 19-20).

---

[2] The testimony does not specify how the recovery of the marijuana was resolved except to note that one of the victims was eventually charged with possession of marijuana. (*Id*. at 47-48).

Following Defendant's Arrest, Officer Beauchamp prepared a Record of Arrest. (*Id*. at 33, 54 & Exh. 1 ("Record of Arrest")). The Record of Arrest states that Officer Beauchamp approached Defendant because he was in the vicinity of the reported burglary, was "sweating profusely," and "appeared to be extremely nervous." (*Id*. at 34 & Exh. 1). Officer Moffitt testified that he believed the Record of Arrest accurately reflected the reason Officer Beauchamp approached Defendant. (*Id*. at 33-34). The Record of Arrest did not include the discovery of either the pill bottles or the marijuana. (*Id*. at 45 & Exh. 1).

An Affidavit of Complaint was also sworn to by Officer Beauchamp and prepared by an investigator charging Defendant with various crimes under Tennessee law. (*Id*. at 45, 54-55 & Exh. 3 ("Affidavit of Complaint")). The Affidavit of Complaint does not mention the recovery of either the pill bottles or the marijuana. (*Id*. at 46-47 & Exh. 3).

Memphis Police Communications also prepared a Background Event Chronology and provided an audio recording in response to a subpoena from Defendant about the police communications relating to the events on August 29, 2013 that culminated in Defendant's arrest. (*Id*. at 147-50 & Exhs. 2 & 7 ("Chronology" and "Dispatch Recording")). Memphis Police Communications Supervisor Marvin Pender testified to the creation, production, and substance of the Chronology and Dispatch Recording. (*Id*. at 147-48, 156). The Chronology begins at 11:53:46 a.m. with an officer—identified by IBM number 11416 and car number 6450—being dispatched to initiate a stop at 919 North Watkins Street near Henry Avenue and Vollentine. (*Id*. at 37, 151-52, 55-56, 160 & Exhs. 2 & 7).[3] The Chronology reflects two subsequent entries involving the same

---

[3] Counsel on behalf of Defendant stated that she introduced the audio recording of the communications to demonstrate the "start time of the event" and to show that an officer, who identifies himself by a car number that the communications operator reflects as "6450," created

7

officer arriving at the location at 11:53:47 a.m. and being made available at 11:54:42 a.m. (*Id*. at 151-52, 160 & Exh. 2). Car number 6450 was not a car on the Crump Station Violent Crimes Task Force at that time, as those were car numbers 6411 through 6419. (*Id*. at 56). Officer Moffitt did not witness any officer other than Officer Beauchamp approach Defendant. (*Id*. at 56).

The Chronology reflects that Officer Beauchamp, identified by IBM number 1926 and car number 6414, was dispatched at 11:54:40 a.m. and arrived at 11:54:46 a.m.. (*Id*. at 30, 37, 56-57, 152-53 & Exh. 2). The Chronology reflects that Officer Moffitt, identified by IBM number 11880 and car number 6411, was dispatched at 11:54:44 and arrived at 11:55:44. (*Id*. at 30, 37, 153 & Exh. 2). The Chronology does not contain any other reference to the officer identified by IBM number 11416 and car number 6450. (*Id*. at 164). The Chronology reflects that Officer Moffitt advised that a suspect was taken into custody at 12:05:09 p.m. (*Id*. at 164-65 & Exh. 2).

With respect to the portion of the Chronology and Dispatch Recording from 11:53:46 to 11:55:44, Pender testified that it appeared to reflect that "the dispatcher dispatched the wrong vehicle on the call, then dispatched the correct vehicle, which was 6415, and cleared 6450 from the call." (*Id*. at 161). Pender further stated as follows: "The dispatcher when the transmission came out, she may have thought she heard 6450 so she dispatched 6450 on the traffic stop. . . . Then she realized it was actually 6415, so she dispatched the correct car on the call. When she knew 6450 was on the call, she made him available and put him back in service." (*Id*. at 161). Pender testified that he also thought the voice on the Dispatch Recording identified himself by car 6450 but, based upon his reading of the Chronology and hearing of the Dispatch Recording, "6415 was the car that made the original traffic stop, and 6411 pulled over with him." (*Id*. at 162-63).

---

the event. (*Id*. at 158).

Defendant elected to testify at the hearing on the instant motion; however, the Court recommends that his version of events is not believable. Defendant claims that Officer Beauchamp was the only officer on the scene for "over 7 to 8 minutes," that the officer that asked "all of those questions" and asked "what was in my backpack." (*Id*. at 174-75, 178). Defendant claims that Officer Beauchamp asked him for his identification, which prevented him from leaving the scene or boarding the bus that he planned to take, and that Officer Beauchamp never returned his identification at any point. (*Id*. at 171-76). Defendant asserts that Officer Moffitt was lying when he testified that he arrived very quickly after Officer Beauchamp's arrival. (*Id*. at 175). However, Officer Moffitt's account of his and of Officer Beauchamp's dispatch and arrival is corroborated by the Chronology of the Dispatch Recording. (*Id*. at Exhs. 2 & 7).

Next, Defendant gives conflicting testimony on how and where he found all of the burglary victims' property. (*Id*. at 177, 181-84). First, he states that the backpack contained running shoes. (*Id*. at 186). Then Defendant testifies that he had been "scrapping" that day "in junk piles picking things up." (*Id*. at 181). He testifies at one point that he did not know what was in the backpack, including whether it contained a firearm, because he "hadn't checked the backpack yet." (*Id*. at 182). He states that "whatever was in the backpack . . . that's where the gun was. I found the backpack." (*Id*. at 182-83). At another point, however, he testifies that he found the gun "in a junk pile." (*Id*. at 182). He testifies that he "guess[es]" that the pill bottles were in the backpack; however, they were recovered on his person despite his claim that he had not opened the backpack." (*Id*. at 177, 184). Defendant further claims that the burglary victims were lying in their testimony, although it is not clear what he believes was untruthful. (*Id*. at 181). However, the burglary victims' accounts both were highly consistent, and there was no indication of any motivation to be untruthful.

9

The burglary victims' testimony is also corroborated by Officer Davis's testimony and the Incident Report.

Finally, Defendant could not recall what happened regarding the search of his backpack. (*Id*. at 188). When asked if Officer Moffitt "rifled through" his backpack, Defendant responded, "[i]t's possible." (*Id*.) Defendant testified that he didn't see Officer Moffitt go through his backpack but never explains why he did not see a search of it. (*Id*. at 189). When asked if it was because Officer Moffitt searched it behind his back, Defendant stated that the backpack was just "over toward the side" and that he did not "know what happened." (*Id*. at 189).

Taken as a whole, Defendant's testimony contains inconsistencies and unlikely scenarios and omits too many details that a person could reasonably be expected to remember. In contrast, the officers' and victims' testimony was consistent and more plausible and believable. Thus, the Court recommends that Defendant's version of events be rejected as not credible.

## II. Proposed Conclusions of Law

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The Fourth Amendment applies to government intrusions when the person has a reasonable expectation of privacy. *Soldal v. Cook County, Illinois*, 506. U.S. 56, 69 (1992); *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978). When the protections of the Fourth Amendment apply, a warrant is generally required unless an exception to the warrant requirement applies. *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002)).

In determining whether the Fourth Amendment's protections are implicated, the Court must

look to the nature of the encounter between law enforcement and the individual. *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000) (quoting *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997) (internal citations omitted)). There are three types of permissible encounters between the police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *Id*.

During a consensual encounter, "law enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." *Waldon*, 206 F.3d at 603. "Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not any subjective suspicion of criminal activity." *Id*. A consensual encounter does not implicate the Fourth Amendment's protections, as it does not constitute a "seizure" or "search" to "approach[] an individual and ask a few questions." *Florida v. Bostick*, 501 U.S. 434, 434 (1991).

An encounter escalates to a seizure and implicates the Fourth Amendment "when a reasonable person, in view of the circumstances surrounding the encounter with law enforcement officials, believes he is not free to leave." *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). A request that the person stay at the location or a request for and retention of the person's property has been held to implicate the Fourth Amendment. *Winfrey*, 915 F.2d at 216; *see also Florida v. Royer*, 460 U.S. 491, 501-502 (1983).

"A temporary seizure under the Fourth Amendment may be justifiable if a reasonable articulable suspicion of criminal activity actually exists." *Winfrey*, 915 F.2d at 216 (quoting *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968)). Such an investigative detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Winfrey*, 915 F.2d at 216 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). Similarly, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id*. The reasonableness of an investigation, then, is a dual inquiry: (1) whether the officers' conduct is supported by articulable suspicion; and, (2) whether the detention and investigative methods used were reasonable under the circumstances. *Winfrey*, 915 F.2d at 216 (citing cases). The government bears the burden of showing the seizure based on reasonable suspicion satisfied the conditions of an investigative *Terry* seizure.

An arrest must be supported by probable cause, which must be determined under the totality-of-the-circumstances approach. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). There is no bright-line test for determining when an arrest occurs. *United States v. Lopez-Arias*, 344 F.3d 623, 627-28 (6th Cir. 2003). The analysis of the conditions and circumstances that rise to the level of arrest is a fact-sensitive inquiry. *Id.* In making this determination, a court shall consider a variety of factors, including, but not limited to: (1) movement or transportation of the detainee from the site of the initial stop or detention to another location; (2) the nature and extent of the imposition of restraint or limitation on freedom of movement involving physical confinement or other coercion; (3) use of weapons or bodily force; and (4) issuance of Miranda warnings. *Id.* However, no single factor is ultimately dispositive of this issue, and the court must look toward the whole of the events in question.

12

In the instant case, the Court recommends that the encounter between law enforcement and Defendant began as a consensual encounter. While Officer Beauchamp was unavailable to testify at the hearing through no fault of either party, Officer Moffitt's testimony along with the Chronology and Dispatch Recording provide the best indication of the circumstances of the initial stages of Defendant's interaction with them. Officer Moffitt testified and the Chronology and Dispatch Recording corroborate that, when he arrived on the scene less than one minute after Officer Beauchamp, he began to ask questions of a preliminary nature such as Defendant's name, date of birth, the reason why he was sweating, the contents of his full backpack, and whether he could search the backpack. Defendant voluntarily responded to certain questions but refused to permit the search, which officers respected.

These are the type of questions that would be appropriate for the initial stages of an encounter and are not indicative of a prolonged encounter between Defendant and Officer Beauchamp—an allegation by Defendant that the Court has found not to be credible and is belied by Officer Moffitt's testimony as well as the Chronology and Dispatch Record. These are also the type of general questions that are permitted during a consensual encounter so long as officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave. The record reflects that Officer Moffitt did not activate his car's blue lights, did not aggressively approach Defendant, did not touch Defendant's person, and did not see Officer Beauchamp—from his position just down the street—do any of these things. Further, while Defendant did refuse the request to search his backpack, this does not automatically terminate a consensual encounter—Defendant remained free to leave, just as the officers remained free to continue general questioning absent intimidation.

Thus, Officer Moffitt completed his WASP database searched, determined that Defendant had "lots of warrants in his past for aggravated burglary," and "just simply asked him, have you ever been arrested for burglary before." In response, Defendant had some type of actual or feigned medical emergency that Officer Moffitt perceived to be due either to a seizure or overheating. Officer Moffitt appropriately requested medical assistance, provided Defendant water, removed his backpack from his back, and sat it on the ground next to him. From the time that the Chronology and Dispatch Recording reflects that the interaction at 919 North Watkins began until the ambulance was called was just over three minutes in duration—an appropriately brief time to conduct a consensual encounter. Also, when Defendant fell to the ground, a pill bottle fell from his pocket. Officer Moffitt noticed that the pill bottle was not prescribed to him but to an individual whose residence was the same as the address where the burglary had just occurred.

At some point after Defendant fell to the ground and the pill bottle was recovered but before the ambulance arrived, the record reflects that Defendant was placed in handcuffs. The Court recommends that Officer Moffitt had developed, at the least, reasonable, articulable suspicion that Defendant had committed the burglary at 664 North Dickinson when the pill bottle was discovered bearing the address of the victimized residence. The Court recommends that it was appropriate, at the least, to detain Defendant to contact the officer at the burglarized residence to verify the address, the victim's names, and any other possessions that were taken. Officer Moffitt did so and very promptly determined that both the address and the victim's name matched the pill bottle.

At this point, the Court recommends that Officer Moffitt had developed probable cause that Defendant had committed the burglary at 664 North Dickinson. Accordingly, it was appropriate to place Defendant under arrest and to search his backpack and person to determine whether further

items from the burglary were contained therein. Further, Defendant does not challenge the adequacy of the probable cause for the arrest or search—only that it was tainted by an unlawful investigative detention without reasonable, articulable suspicion. As the Court recommends that no unlawful detention occurred, that a brief investigative detention was based upon reasonable, articulable suspicion, and that the arrest and search of Defendant's person and backpack were based upon probable cause, the Court further recommends that no violation of the Fourth Amendment occurred.

**III. Conclusion**

For the reasons set forth herein, it is recommended that Defendant's Motion to Suppress be DENIED.

**DATED** this 24th day of December, 2014.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**